# CHARLESTON.

LUCILE CROUCH v. FLOYD M. WARTENBERG.

Submitted April 25, 1922.          Decided May 2, 1922.

1. MARRIAGE—*Where, by Previous Agreement, the Parties Never Assumed the Relation, the Marriage Will be Annulled.*

   Where parties to a marriage ceremony have prior thereto mutually agreed that such ceremony shall not be binding, and that they shall not in fact be man and wife, immediately after the ceremony separate and live separate and apart

and do not assume any of the duties, obligations or responsibilities attendant upon the marriage relation, and by word and deed consistently manifest their mutual agreement and understanding entered into before the ceremony is performed, and within three days thereafter apply for an annulment to the courts, equity has jurisdiction to and will annul such supposed marriage, it appearing that such ceremony originated in, and was consummated as the result of a jest. (p. 92).

2.  SAME—*Is Based on Contract, Interpreted Generally as Other Contracts.*

Marriage, at its inception, is based on contract, and generally such contract, as to its binding force, is interpreted and governed as other contracts. p. 94).

3.  SAME—*Evidence Held to Sustain Allegations of Bill to Annul.*

The evidence in this case sustains the allegations of the bill, and the principles announced in the former appeal, *Crouch* v. *Wartenberg*, 86 W. Va. 664, govern and are applied. (p 94).

(LIVELY, JUDGE, absent).

Appeal from Circuit Court, Cabell County.

Bill by Lucile Crouch against Floyd M. Wartenberg. Relief denied, and bill dismissed, and plaintiff appeals.

*Reversed, and decree annulling marriage entered.*

*Bowman & Taylor,* for appellant.
*Jean F. Smith,* for appellee.

LIVELY, JUDGE:

The principles of law governing this case were pronounced in *Crouch* v. *Wartenberg*, 86 W. Va. 664, 11 A. L. R. 212, upon demurrer to the bill, and all that remains upon this appeal is to ascertain if the allegations of the bill have been sustained by the evidence. The bill seeks annulment of a marriage ceremony performed between plaintiff and defendant on the 31st day of January, 1920, in the City of Huntington, West Virginia. The circuit court denied the relief prayed for, dismissed plaintiff's bill and she appealed to this court.

Plaintiff who was 19 years of age, had known defendant about three months and marriage had been discussed between

them.  At a party held at one of the hotels on the evening
of the 30th day of January, 1920, it was proposed by some
one that the plaintiff and defendant proceed to be married
on that occasion, and that a license be then obtained.  The
proposition was made and acted upon in a spirit of jest, but
without any apparent intention of its consummation, and
was evidently the caprice of exuberant youthful spirits.  It
became rumored that the parties were to have been married
in good faith at that time and for some unexplained cause it
failed of consummation, and the press reporters published
a "story" with the modern colorings, for public consumption.
Next day, about 2 o'clock P. M., plaintiff was on her way to an
appointment with her dentist, when, upon invitation, she
entered the automobile of a member of the party of the
evening before, and later defendant got in the car, and
told plaintiff that so many people had heard that they were
going to be married the night before, and that she had re-
fused to do so at the last minute, that it would ruin him as
he was just starting in business in the city, and it would
cause him loss of business unless something was done to
prevent it.  After consultation among themselves and de-
fendant's friends, it was concluded that the ceremony would
be at once performed in order to save any further embarrass-
ment, but that the marriage should be in form only and that
they would not live or cohabit together.  She stated to him
she did not love him, and did not want to become his wife,
and he agreed that he would not expect anything from
her by virtue of the ceremony, and that he would procure
an annulment as soon as possible.  It appears that there
was no intention on the part of either that they should be-
come man and wife in any sense.  It seemed to be an ill-
advised step to relieve him from what he thought was a
situation which would affect his business and social standing.
She was nervous and excited, and upon his assurances of a
speedy annulment of the ceremony, went with him for the
license, while a friend of his procured a wedding ring, thence
to the minister where the ceremony was performed with all
outward show of a valid marriage.  Immediately upon leav-

ing the parsonage, they separated. She went to a relative's house where she talked with her mother over the telephone telling her of her escapade, thence she went home. She never lived or cohabited with defendant. On the third day after the marriage ceremony, they went together to consult counsel and the suit for annulment was immediately instituted. Subsequently she resumed her studies in a University. Defendant does not defend the suit. The divorce commissioner filed an answer substantially denying the allegations, upon information and belief. Defendant was introduced as witness by the divorce commissioner, and corroborates the statement of plaintiff in every material part. He says he did not marry her in good faith, and told her that he would have the ceremony annulled, or "got rid of" at the earliest possible time after the ceremony. He says he never lived or cohabited with her, and while he was in a position to provide her a home, was never ready or willing to do so; that he did not deceive or coerce her into marrying him, that they both understood that they would have the ceremony performed and then cancelled, that they did not intend to live together, and that the whole matter originated in a jest the night before. We think the evidence clearly establishes that the ceremony, although actually entered into and performed in the manner provided by statute, was the outcome of a jest, and was entered into by the parties, with no intention of being man and wife in the legal sense, with the understanding that they would not be bound thereby and have no privileges or obligations incident thereto; and that no subsequent acts or conduct on their part indicated otherwise. They were both young, illy advised, and were attempting to extricate themselves from what they considered an embarrassing situation; and, as is usual with inexperienced and impulsive youth, acted hurriedly without deliberation or consultation with relatives or those upon whom they should have relied. As usually happens in such cases, the result was more serious embarrassment.

A marriage is regarded as a civil contract at its inception. The minds of the parties must meet in good faith for the

purpose of carrying out the contract by cohabitation as husband and wife, and the assumption of the duties and obligations incidental to the marriage relation. Without such intent, words and ceremonies will not make a valid marriage contract. Of course, it must be clear and unequivocal that the parties did not agree to assume, in law and in fact, the marriage relationship; and that no subsequent act or conduct was performed which would warrant the court in arriving at a different conclusion. Much is said by the divorce commissioner of the sanctity of the marriage relation as viewed from the standpoint of morals and public policy. It is argued that marriage should be fostered and encouraged, and divorces and separations discouraged, that the right to a divorce being granted by statute should be strictly guarded and granted only for the statutory causes. These observations apply where there is a consummation of the marriage contract and the legal relation of man and wife has been assumed and actually exists. It must be remembered that such is not the case here. The parties never intended to enter into the relation, separated immediately after the ceremony, and never recognized it as binding by subsequent word or act. On the other hand, it would be against public policy and justice to destroy the lives and happiness of these young persons by forcing them against their will to live together, or forcing the alternative of living lives of celibacy. No home will be destroyed, for none has been formed. Perhaps severe censure is due them for trifling with the outward and legal forms of the sacred relationship, but we do not think the censure should go to the extent of wrecking their lives, and their future usefulness to the state and society. Perhaps the publicity and humiliation brought about by these proceedings is punishment sufficient for them, and to warn others. There was no intent, express or implied, on the part of either of the parties to enter into a contract of marriage. In addition to the case of *McClurg* v. *Terry*, 21 N. J. Eq. 225, referred to in the former decision, the following text writers and decisions sustain our conclusions: 1 Bishop, Marriage and Divorce, secs. 296, 298, 339, 366 et seq.; Spencer, Law of Domestic Relations, sec. 37; *Clark* v. *Field*, 13 Vt.

460; Story, Conflict of Laws, Vol. 1, sec. 108; 1 Blackstone 433; 2 Kent Comm. 87; *Svenson v. Svenson,* 178 N. Y. 54.

The plaintiff is entitled to the relief prayed for in her bill, and a decree will be entered here awarding her annulment of the marriage, and her costs in this and the lower court.

*Reversed, and decree annulling marriage entered.*